# Why the Federal Sentencing Guidelines Should Be Scrapped

## By Jed S. Rakoff

Before describing my proposal to replace the current federal sentencing guidelines in their entirety with a nonbinding, nonarithmetic, multifactor test, it may be useful to briefly review the sad history of the guidelines, because, as George Santayana famously said, "Those who do not remember the past are condemned to repeat it." Of course, who remembers George Santayana? Still, a brief review of the origins and somewhat ironic evolution of the guidelines may be helpful.

26  PHOTOGRAPH ■ iSTOCK

The immediate intellectual impetus for the guidelines was a book titled *Criminal Sentences: Law without Order* by Marvin Frankel, a well-known judge of the Southern District of New York, who—before going on the bench—was a professor at Columbia Law School. The book came out in 1973, and it was typical Frankel: brilliant, witty, provocative—and somewhat contemptuous of Frankel's fellow judges. Basically, Frankel said that when it came to sentencing, too many judges were lazy, stupid, occasionally sadistic, and in any case uninformed about what Frankel (who was married to a psychiatrist) considered essential for sentencing, namely, psychiatric and sociological insights. To back up his attack, he gave some examples of what he thought were unjustifiably disparate sentences, which, he argued, were the result of federal district judges being given too much discretion in sentencing and of their sentences not being subject to meaningful appellate review.

Looking back at Frankel's account, the disparities that he describes with considerable moral outrage do not look so bad, at least so far as white collar sentences are concerned, because, by current standards, they were still within a somewhat modest range. I can state from personal knowledge that in 1973 in the Southern District of New York, the main question in white collar sentences was simply: jail or no jail. Certainly there were disparities: there were judges who were known to be lenient and judges who were known to be harsh. But very rarely was there imposed a prison term of more than five years for a white collar crime (though I describe below one of the rare exceptions).

To be sure, the seeming discrepancies in sentences imposed in cases involving street crimes were greater; and there was also an arguable disparity between the low sentences imposed for white collar crimes in general as compared to those imposed for street crimes. Judge Frankel was very upset about all this, felt it was lawless. He recommended that there be an independent sentencing commission that would promulgate guidelines that, while not entirely binding, would create presumptions that a judge would have to follow unless the judge could provide a good reason for not following them. In that sense, his suggestion was for a system superficially similar to what we have now.

If you look a little more carefully though, he had in mind a very different kind of sentencing commission and guidelines than what we now have. As mentioned, Frankel was very concerned with the psychological and sociological makeup of criminal defendants—something that the present guidelines virtually ignore—and his commission would have consisted of, not just lawyers and judges, but also "sociologists, psychologists, business people, artists, and, lastly for emphasis, former or present prison inmates." (MARVIN E. FRANKEL, CRIMINAL SENTENCES: LAW WITHOUT ORDER 120 (1973).) A sense of political reality was perhaps not Judge Frankel's forte.

Beyond all else, Judge Frankel, a good liberal of his time, wanted less harsh sentences than what he perceived to be the overly punitive sentences meted out by his fellow judges; and it is ironic, reading his book now, to realize that he provided the intellectual underpinning for the vastly more punitive sentencing structure that the federal guidelines now impose. (For a definitive account of the origins of the guidelines, see KATE STITH & JOSE A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS (1998).)

### Enactment of Guidelines

Not long after his book appeared, Frankel was introduced to Senator Ted Kennedy, who was very attracted to the notion of sentencing guidelines because he perceived that there was considerable racial disparity in sentences. It was Kennedy who introduced legislation in 1975 to create the Sentencing Commission and sentencing guidelines. That effort failed, as did a number of subsequent efforts by Kennedy and others who sought to reform the criminal code. By the early 1980s, Ronald Reagan was president and the Senate was in Republican hands, so in order to get the bipartisan support that was needed, Kennedy agreed to several compromises. The two key compromises were (1) that the guidelines would be binding—an idea originally proposed, for political reasons, by Senator Gary Hart, but quickly adopted by Senator Strom Thurmond, who pushed it through the Senate; and (2) that a majority of the Sentencing Commission would consist of political appointees.

Though not necessarily apparent at the time, these changes were a recipe for more severe sentences because the nonjudicial members of the Sentencing Commission would be subject to more political pressures or desires (this was a period of time when "law and order" was the watchword of the day), and they would be inclined to enact fairly harsh sentencing guidelines that would be binding on all concerned. And that is essentially what happened. But it only happened consciously with respect to white collar sentences. Initially, the Sentencing Commission believed it was just creating sentences that were the average or mean of federal sentences previously imposed throughout the United States (though that changed very quickly in subsequent years). But in the case of white collar sentences, the object from the outset was to mandate sentences that were greater than those typical of the past. This was both because it was believed that the relatively low white collar sentences did not provide sufficient deterrence in this area, and because it was felt that white collar defendants, who were mostly Caucasian, were getting off too lightly compared to the persons of color who committed most street crimes.

JED S. RAKOFF *is a US district judge for the Southern District of New York, and a member of the ABA Criminal Justice Section's newly created Special Task Force on the Reform of Federal Sentencing for White Collar Crimes. This article is revised from a speech given at the American Bar Association's 27th Annual National Institute on White Collar Crime in Las Vegas on March 7, 2013.*

You can argue about whether these perceptions were accurate. There is a considerable body of literature that suggests that even small amounts of prison time can achieve substantial deterrence in the case of nonviolent crimes (whether they be "white collar" crimes or just modest instances of theft, fraud, or embezzlement). And some people might also argue that violent crimes demand considerably greater punishment than nonviolent crimes, even if this also leads to a superficial racial disparity. But none of these and other debates, in my view, warranted the irrational scheme that the sentencing guidelines, enacted in 1983, proceeded to impose.

### "Measurable" Quantities Don't Add Up

Perhaps the most fundamental flaw in the sentencing guidelines is that they are based on the assumption that you can, in the name of reducing disparities, isolate from the complexity that every sentence presents a few arbitrary factors to which you then assign equally arbitrary weights—and somehow call the result rational.

much money he is going to get: he pulls out his gun and he asks the teller for everything the teller has. If he is lucky, he might get as much as $10,000; if he is unlucky, he may get only $2,000 or $3,000, or less. Under the guidelines, the guy who takes $10,000 gets twice the prison time that the guy who takes $2,000 or $3,000 gets; yet the difference was pure happenstance. It had almost nothing to do with the fundamental nature of the crime, with the defendant's intent, with the deterrence of the crime, or with anything else about the crime that is really meaningful for sentencing.

I will give you another example, from my own prior experience as a federal prosecutor. One spring I had two trials back-to-back (these were the days when you actually had trials). One defendant was a guy who went about defrauding widows of their life savings; this was a really evil man, and he typically left these poor widows both distraught and destitute. But the total loss, because none of these women had that much money, was under $100,000. The other trial involved a "pump and dump" securities

> These are just numbers and yet, once they are in place, the whole thing is blessed and said to be both reasonable and necessary.

The numbers themselves are drawn from nowhere. Indeed, the Sentencing Commission to this day has never been able to articulate why it assigns two points for this, or four points for that; these are just numbers and yet, once they are in place, the whole thing is blessed and said to be both reasonable and necessary.

But equally bad is the insistence that the great majority of sentences may be fairly arrived at by reference to just a very few factors. This is especially apparent with respect to the two kinds of sentences that are the most common in the federal system: drug sentences and white collar sentences. Somewhere between 50–70 percent of the sentencing guidelines calculation in each of these categories is based on a single factor: in drug cases, it is based on the weight of the drugs actually distributed or intended to be distributed, and in white collar cases, it is based on the amount of the actual or intended economic loss imposed.

Why this overwhelming focus on a single factor in each of these situations? I suggest it is because weight and loss are much easier to measure than, say, the depth of the defendant's intent or the degree to which social background or mental health affected the individual's actions; and the guidelines, being arithmetic in nature, naturally gravitate toward arithmetically measurable factors. But it should be obvious that in a great many—perhaps most—cases, the weight of the drug or the amount of the loss does not fairly convey the reality of the crime or the criminal.

Professor Kate Stith and Judge Jose Cabranes, in their wonderful book *Fear of Judging*, give the example of the bank robber who goes into the bank with no idea how

scheme, where the guy defrauded about 1,000 high-roller victims—people who loved to invest in high-risk penny stocks—of about $1,000 each, so that the total loss was about $1 million. When it came time for sentencing—this being before the time of the guidelines—one judge gave the "pump and dump" guy five years, and a different judge gave the widow-defrauder an unusually heavy sentence for that time, 15 years. And that seems to me exactly right. They were both bad guys, but the guy who was leaving these widows destitute at a time in their lives when they most needed money was inflicting far greater pain than the more conventional fraudster.

If you look at the guidelines, however, the "pump and dump" guy would get about 10 years and the widow-defrauder, even after an increase for "vulnerable victims," would still only get about three years. This is not only effectively the opposite of what they actually got, it is the opposite of what it seems to me the facts call for. And why these results? Because the guidelines say that the be-all and end-all in such cases is the amount of the loss.

### Guidelines Force Justice Behind Closed Doors

Such bizarre results under the guidelines are, in my experience, more the norm than the exception: a function of singling out a single factor for emphasis and then ascribing it overwhelming weight. Furthermore, even the notion that the weight of the drugs or the amount of the economic loss are objectively measurable quantities is, in practice, an illusion—because the amounts can be "negotiated" as part of a plea bargain. Thus, as part of a plea, a prosecutor

can permit a defendant to plead to a superseding information or the like that greatly narrows the scope or duration of the conspiracy that was charged in the original indictment, and thereby reduces hugely the weight of the drugs or amount of the loss calculated in the pleading defendant's case.

This, as is well known, is just one of the many instances in which the guidelines practically remove sentencing from the judge and place it in the hands of the prosecutor, who effectively negotiates the sentence without any judicial oversight or public scrutiny whatsoever. This, in turn, has led to disparities far greater than any that existed prior to the guidelines. (And this is quite aside from the notorious multiplier by which an ounce of crack cocaine is treated for guidelines purposes as if it were the equivalent of 18 ounces (previously 100 ounces) of chemically identical powder cocaine, thus creating a racial disparity between the mostly African-American crack cocaine offenders and the mostly Caucasian and Hispanic powder cocaine offenders. This guidelines-created racial disparity is more extreme, more state-sponsored, and more entrenched than any racial disparity said to exist before the guidelines were enacted.) And by placing in the hands of the prosecutor the power to dangle huge rewards before those who plead guilty, it has made it far riskier for a defendant to go to trial than it ever was before the guidelines.

The statistics on this are very telling. For decades, 15 percent of all federal defendants went to trial, but within two years after the passage of the guidelines, that figure went down to 3 percent, and it remains at 3 percent today. By placing such power in the hands of prosecutors, the guidelines create incentives for even those who are innocent to plead guilty; but even worse is its impact on the criminal justice system as a whole: because the trial is the one place where the truth comes out and where the system gets tested in a public forum. But now, thanks largely to the guidelines, what we have is a system of criminal justice that occurs almost exclusively behind closed doors. That is not a good way for a democratic society to handle a matter of such importance.

### Why Construing the Guidelines as "Discretionary" Is Not Enough

You might ask, why didn't *Booker* change all this when it made the guidelines discretionary rather than mandatory? (United States v. Booker, 543 U.S. 220 (2005).) The statistics show that the overwhelming majority of federal judges still either follow the guidelines or, even when they give a nonguidelines sentence, deviate only very modestly from the guidelines range. Why is that? First, it is the path of least resistance: the parties come with a stipulated guidelines range, the judge can adopt the presentence report's factual findings, and if he or she gives a guidelines sentence it is virtually immune from any reversal on appeal — it's the easier way to proceed. Second, sentencing, as any judge will tell you, is no fun, and following the guidelines permits the judge to avoid the difficult moral questions that sentencing inevitably presents. Third, there are increasingly few judges who have ever had any sentencing experience except under a guidelines regime. And fourth, even after *Booker*, the very first thing a judge is still required to do at sentencing is to calculate the guidelines range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far. This last factor, moreover, operates with particular vengeance in white collar cases because at the behest of Congress, the Sentencing Commission has steadily increased the severity of the white collar guidelines, again mostly by manipulating the loss levels, so that, as Professor Stith has pointed out, the sentencing guidelines calculation for a typical securities fraud is 500 percent greater today than it was under the original guidelines. And there has been a substantially corresponding increase in the length of white collar sentences, even after *Booker*.

There have been some judges, however, who have taken more seriously the message of *Booker*, and of § 3553(a) of the US Criminal Code, that the guidelines are just one of many factors to be considered at sentencing. This has upset the Department of Justice (DOJ)—in 2010, the director of the Criminal Division's Office of Policy and Legislation, who is also the DOJ's designated member of the Sentencing Commission, wrote a letter to the commission complaining that, while most federal judges still followed the guidelines, there was developing "a second regime that has largely lost its moorings to the sentencing guidelines." (Letter from Jonathan J. Wroblewski, Dir., Office of Policy & Legislation, U.S. Dep't of Justice, to the Honorable William K. Sessions III, Chair, U.S. Sentencing Comm'n 2 (June 28, 2010) [hereinafter DOJ Letter].) Frankly, I would have been disappointed not to have been included in this "second regime," but there was no such danger: for the letter provided a listing of four white collar sentences labeled as flatly "unacceptable" (DOJ Letter, *supra*, at 5), one of which was my decision in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).

The facts of *Adelson* are instructive. Adelson was the president of a biotech company that had a particularly hard-driving CEO, who demanded that her executives meet her optimistic projections for each quarter. In response, the chief financial officer (CFO), fearing for his job—but without the knowledge of either the CEO or Adelson—concocted an accounting fraud that made it appear that the projections were being met. Although the fraud lasted for about three years before it was uncovered, it was never known to the CEO; but it became known to Adelson about six months before the end, and he covered it up. Under ordinary principles of conspiracy law, this made him co-liable for the entire loss experienced when the fraud was uncovered. Although the government estimated the loss at $200 million, it was unable to establish this at the sentencing hearing; but, although under the guidelines I could then have held that the loss was indeterminate (which would have resulted in a very low sentence for Adelson), instead I determined that the conspiratorial plan envisioned a concealment that would have likely led to a loss of at least $50 million. To be sure, there were

hundreds of thousands of shareholders in the company and so the loss per share was modest; but the overall figure of $50 million meant that, under the sentencing guidelines, and regardless of any other factor, Adelson's guidelines range was life imprisonment.

I pause here to state the obvious: life imprisonment, in such a situation, was absurd on its face. Even the CFO who designed the fraud (and who got a low sentence because the government gave him a cooperation agreement) did not merit life imprisonment. As for Adelson, he was neither the originator of the scheme nor its leader, nor its primary participant, nor its primary beneficiary. He had no prior criminal history and, indeed, had otherwise led, not simply a blameless, but an exemplary life. I gave him three-and-a-half years. The DOJ appealed the sentence, but the Second Circuit affirmed by summary order. (United States v. Adelson, 301 F. App'x 93 (2d Cir. 2008).)

Please don't misunderstand; I am not opposed to heavy sentences in appropriate cases. For example, around the same time I sentenced Adelson, I gave the crooked lawyer Marc Dreier 20 years in prison. But Dreier was not only the designer and leader of an even larger fraud, he also had virtually none of the mitigating personal characteristics that were present in Adelson's case. My quarrel, in short, is not with heavy or light sentences per se, but with the irrationality of the guidelines, which leads to unjust results in case after case after case, *Adelson* being just one example.

### Proposed Multifactor Sentencing Approach

So what should we do about this? Well, here is a modest suggestion for your consideration. In federal civil cases, there are many, many examples of so-called multifactor tests decreed by the appellate courts. A classic example is the famous decision of Judge Henry Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), in which the Second Circuit (now followed in this respect by virtually every other circuit) devised an eight-factor test for determining whether a valid claim has been made for trademark infringement. In subsequent cases elaborating *Polaroid*, the Second Circuit made clear that none of the factors was necessarily dispositive and other variables might weigh heavily in a given case, but, at a minimum, a district judge deciding the issue had to state in writing how each of the eight factors played out in the particular case and how the judge had then weighed those factors, and any others, in coming to a decision. This analysis, a mixed matter of fact and law, was then subject to close scrutiny on appeal.

Now in the guideline context, what I would suggest is that for every category of crime the Sentencing Commission devise a list of factors, unweighted but fairly detailed, each of which a sentencing judge would be required to address in writing, stating how it applied (or did not apply) to the case at hand, what other factors might also be relevant, and how the combination should be viewed in the context of that particular case in arriving at the sentence imposed. This analysis would then be subject to fairly robust review on appeal. The advantage would be that a district judge, without being saddled with arbitrary weights and measures, would be required to address all relevant factors and show why, or why not, they led to a given sentence.

Would this approach lead to more "disparity"? Yes, if by disparity one means any deviation from an artificial numbering system dictating a sham consistency; but no, if one is concerned with true disparities, that is, like cases not being treated alike: for the combination of having to consider every factor and state in writing how they interplay in a given case, when coupled with a searching appellate review, would soon develop a common law of sentencing that would eliminate outliers without sacrificing individual circumstances. To be sure, it would require a lot of work on the part of judges. If you agree with Judge Frankel that judges are lazy, dumb, and uneducated, then this solution may not appeal to you. But if you believe that sentencing is more properly the role of judges than of adversarial prosecutors or distant, number-crunching commissions, and that judges are serious when they tell you that sentencing is among the most important things they do, you might be willing to give this new approach a try. ■

# Recruit to Win!

Interested in a chance to win Career Coaching Sessions and a $1,000 Shopping Spree?

Recruit new ABA lawyer members with a free trial ABA and Section membership!

Go to **ambar.org/ABAWorkLife** for full rules. Ends May 31, 2014.

No purchase necessary to enter or win. Void where prohibited by law.

# CRIMINAL JUSTICE

AMERICAN BAR ASSOCIATION ■ SECTION OF CRIMINAL JUSTICE
WINTER 2014  VOLUME 28, NUMBER 4

## DEPARTMENTS

**1  Chair's Counsel**
SECTION OFFERS FORUM FOR DISCUSSION OF GUN POLICY

**41  Federal Sentencing**
FEDERAL BOP PUTS A LITTLE COMPASSION IN ITS NEWEST RELEASE PROGRAM

**44  Criminal Justice Matters**
FELONY MEDIATION: ANOTHER TOOL TO RESOLVE CASES

**46  Trial Tactics**
PROPER AND IMPROPER USE OF OTHER ACT EVIDENCE

**49  Boot Camp**
AUTHENTICATING SOCIAL MEDIA IN EVIDENTIARY PROCEEDINGS

**51  Practice Pointers**
HOW EARLY SHOULD DEFENSE GET *BRADY* MATERIALS?

**53  Cert Alert**
SUPREME COURT CASES OF INTEREST

**57  Federal Rules Alert**
CONGRESS APPROVES CHANGES

**58  Section News**
THE SIXTH ANNUAL FALL INSTITUTE HIGHLIGHTS

**60  Book Reviews**
A CALL TO DUTY: WHY JURY SERVICE MATTERS

**61  In Memoriam**
MYRNA S. RAEDER

*Criminal Justice* (ISSN 0887-7785) is published quarterly as a service to its members by the American Bar Association Section of Criminal Justice. Copyright © 2014 American Bar Association. Editorial, advertising, circulation, subscription offices: 321 N. Clark Street, Chicago, IL 6065. Section offices and staff: ABA, 1050 Connecticut Ave., NW 4th Floor, Washington, DC 20036.

Any member of the ABA may join the Section of Criminal Justice by sending annual dues of $40 to the Section ($20 of which funds *Criminal Justice* magazine and is not deductible); ABA membership is a prerequisite to Section membership. Individuals and institutions not eligible to join the ABA may subscribe to *Criminal Justice* for $48 per year, $57 for subscriptions addressed outside the United States and its possessions. Single copies are $10 plus $5.95 for postage and handling. For subscriptions and back issues, contact the ABA Service Center at service@americanbar.org or (800) 285-2221.

To write for us, contact the editor, MaryAnn Dadisman, at maryann.dadisman@americanbar.org or visit the website at http://www.americanbar.org/publications/criminal_justice_magazine_home.html. Opinions expressed in the magazine do not necessarily reflect the policies of the editorial board, the Section, or the American Bar Association.

Periodicals postage paid at Chicago, Illinois, and at additional mailing offices. **POSTMASTER:** Send address changes to *Criminal Justice* Member Records, American Bar Association, ABA Service Center, 321 North Clark St., Chicago, IL 60654-7598. **Members:** Go online at www.abanet.org and click on "Membership" and "Update Your Profile."

**Advertising:** Sales & Business Manager, Anne Bitting: 312/988-6115. Address advertising materials to ABA Publising Advertising Sales, 321 N. Clark St., Chicago, IL 60654-7598.
**Reprint Permission:** Contact Copyrights online at www.abanet.org/reprint.

**EDITORIAL BOARD**
**Chair**
Andrew E. Taslitz

**Vice Chair**
Richard A. Ginkowski

**Members**
Hon. Arthur L. Burnett, Sr.
Michael D. Dean
Janet Fink
Justin P. Murphy
Myrna S. Raeder
Matthew F. Redle
David E. Roth
William A. Schabas (ISRCL Liaison)
Sherri L. Schornstein
Mara V. Senn

**Columnists**
J. Vincent April II
Nimrod Haim Aviad
Arthur L. Burnett, Sr.
Michael D. Dean
Alan Ellis
Carol Garfiel Freeman
Mathias H. Heck, Jr.
EJ Hurst II
Matthew F. Redle
Stephen A. Saltzburg
David A. Schlueter
Kyo Suh

**ABA PUBLISHING**
**Director, ABA Publishing**
Bryan Kay

**Director, Editorial**
Claire Parins

**Editor**
MaryAnn Dadisman
MaryAnn.Dadisman@americanbar.org

**Director, Design/Production**
Nick Panos

**Art Director**
Andrea Siegert
Andrea.Siegert@americanbar.org

**Production Coordinator**
Karrie Dowling

**Cover Image**
iStockphoto.com/Hammondovi



American Bar Association
Criminal Justice Section