

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

April 15, 2014

**BY ELECTRONIC MAIL**

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:  **United States v. Rashawn Vassell**,
       S1 12 Cr. 626 (ER)

Dear Judge Ramos:

  The Government submits this letter in connection with the sentencing of defendant Rashawn Vassell, a/k/a "Bash," currently scheduled for April 17, 2014 at 4 p.m.  For the reasons set forth below, the Government respectfully submits that the Court should sentence Vassell to a sentence of 240 months of imprisonment, consistent with the United States Sentencing Guidelines ("U.S.S.G.") range in this case.

I.  **Background – Offense Conduct**

  As the Court is well aware, this case centers on the failed robbery and resulting murder of Jeffrey Henry, a/k/a "the Joker," in Newburgh, New York on December 15, 2010.  The robbery and murder involved nine principal players: (1) Raymond Christian, a/k/a "Reckless," (2) Glenn Thomas, a/k/a "Gucci," (3) Tyrell Whitaker, a/k/a "Bow Wow," (4) Rashawn Vassell, a/k/a "Bash," (5) Eric Cromartie, a/k/a "Baby E," (6) James Williams, a/k/a "L-1," (7) Kevin Burden, a/k/a "Kev Gotti," (8) Anthony Baynes, and (9) Laquavious Boykin, a/k/a "Quay Quay."

  At Vassell's trial, the Government would have proven that on December 15, 2010, Jeffrey Henry was murdered at 54 Chambers Street in Newburgh, New York.  According to cooperating witnesses, on the date in question, Raymond Christian, a/k/a "Reckless," and others decided to rob 54 Chambers Street, from which it was known that Henry and others sold crack cocaine and marijuana.  Christian then met James Williams, a/k/a "L-1" or "Big L," on Dubois Street in Newburgh and asked if Williams wanted to participate in the robbery.  Williams was a high-ranking member of the "G-Shine" set of the Bloods (Christian was a member of a spin-off gang known as "Star Status"), and a prominent drug dealer in the area.  Williams agreed to help Christian rob Henry's house, and Williams made some calls about recruiting additional people and getting guns in order to commit the robbery.

Hon. Edgardo Ramos
April 15, 2014
Page 2 of 6

        One of Williams's phone calls was directed to Kevin Burden, a/k/a "Kev Gotti," who
operated a marijuana spot on First Street and was storing two guns, or "chains," for Williams.
Thereafter, Williams sent two individuals from Williams's Bloods set – Glenn Thomas, a/k/a
"Gucci," and Tyrell Whitaker, a/k/a "Bow Wow" – to Burden's house.  Burden led Thomas and
Whitaker to the basement, where they retrieved the guns.  Williams and Christian also recruited
Vassell, who had committed robberies and sold drugs with his co-defendants in the past, to join
the robbery crew.

        Later that evening, as captured by street/pole cameras on First Street and Chambers
Street, a group of seven individuals, including Christian, Thomas, Vassell, Whitaker, Cromartie
(who is now deceased), Boykin and Baynes (who has been prosecuted as a juvenile in the state
for the instant robbery) – went together to 54 Chambers Street.  All of the robbers had masks,
and all but Baynes and Boykin had guns.  When they arrived at the target apartment building,
they encountered some of its drug customers outside.  They forced one of them inside the
building, and proceeded to the first floor apartments from which drugs were sold.  The robbers
found several people in the apartments (but not Henry) and, although the victims did not have
guns, the victims struggled with the robbers and one of the victims managed to get Christian's
gun (and rip off his ski mask).

        A gunfight then ensued between the victims and robbers.  During the struggle, one victim
was shot in the leg and, shortly thereafter, that same victim stabbed Baynes (he survived and
went to the hospital, which led to his arrest).  During the gunfight, Jeffrey Henry returned to the
apartment building and heard the shooting.  While standing on the outside of the building, he
grabbed the front door and tried to hold it closed (presumably to trap everyone inside) while he
called 911.  The Government has the 911 call, and the gunfire can be heard on the call.

        On the other end of the door, the robbers were trying to evade the gunshots from the
victims and exit the house.  They were all lined up at the front door, trying to pry it open while
Henry tried to hold it shut.  In particular, three of the robbers – Thomas, Whitaker and Vassell –
were taking turns trying to pull the door open while the others were reaching through an opening
in the door to shoot at Henry.[1]  Based on the 911 call, it appears that after one of their shots hit
Henry, he may have released the door.  A second shot also hit Henry (either before or after
Henry released the door) and the robbers all ran from the apartment.  Their flight from the
apartment was, again, captured by street cameras.  Henry stumbled a few steps from the
apartment and collapsed, dying shortly thereafter.

---

        [1]    The Government had previously represented to the Court and defense counsel that it was two individuals,
Whitaker and Thomas, who were shooting out the door at Henry.  This was based on the Government's review of a
March 2012 report, drafted by an FBI Special Agent, after a cooperating witness (the "CW") was debriefed about
what had happened during the murder.  The Government has since begun preparing for trial against Vassell's co-
defendants.  In particular, the Government has met again with the CW.  The CW clarified that the March 2012 report
contained a critical error.  He explained that he never would have said that it was just Whitaker and Thomas
shooting.  He said that all of the robbers were in a line trying to get of the building, and that it was Whitaker,
Thomas and Vassell who were in front of him, trying to pry open the door and shooting.  To the extent that the
March 2012 report said something different (and that the Government relied upon that report in its previous
representations in this case), the error seems to have been made by the FBI agent, and not the CW.

Hon. Edgardo Ramos
April 15, 2014
Page 3 of 6

The police responded to the murder scene almost immediately and recovered, among other things, crack cocaine, numerous shell casings, a ski mask that had Christian's DNA on it, and blood samples from a wall that contained Baynes's DNA.  After the murder, at least some of the robbers returned to the marijuana spot on First Street covered with blood and requested that they be given garbage bags (presumably to get rid of evidence, such as bloody clothes or guns).

## II.     Indictment, Plea and Sentencing

In August 2013, a grand jury sitting in this District returned Indictment S1 12 Cr. 626 (ER) (the "Indictment") charging Vassell and his co-defendants, in five counts, with: (1) conspiring to commit an armed robbery in Newburgh, New York, of individuals they believed to possess narcotics and narcotic proceeds, in violation of Title 18, United States Code, Section 1951; (2) committing, attempting to commit, and aiding and abetting the commission of an armed robbery at 54 Chambers Street, Newburgh, New York, on December 15, 2010, of individuals who possessed narcotics and narcotic proceeds, in violation of Title 18, United States Code, Sections 1951 and 2; (3) conspiring to distribute marijuana and crack, in violation of Title 21, United States Code, Section 846; (4) using a firearm, and aiding and abetting the use of a firearm, in the course of the robbery conspiracy, the robbery, and the attempted robbery charged in Counts One and Two, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2; and (5) using a firearm that caused the death of Jeffrey Henry, in violation of Title 18, United States Code, Sections 924(j)(1) and 2.

Vassell was one of the first two defendants to plead guilty on December 4, 2013.  In the months leading up to Vassell's guilty plea, his attorney, Andrew G. Patel, Esq., had engaged our Office in plea discussions regarding Vassell.  In particular, Mr. Patel presented a number of sympathetic facts about Vassell and his upbringing – many of which he has presented now to the Court in advance of his sentencing – in supporting his request that we allow Vassell to plead guilty to something other than the 924(j) murder count.

Persuaded by Mr. Patel's advocacy, the Government offered Vassell a plea agreement (the "Plea Agreement") in which we accepted his guilty plea to Count One of the Indictment, the robbery conspiracy.  In the Plea Agreement, and then also his plea allocution on December 4, 2013, Vassell acknowledged that the December 15, 2010 robbery resulted in the death of Jeffrey Henry. Specifically, the defendant stipulated in the Plea Agreement that U.S.S.G. § 2B3.1(c)(1) applied because a victim was killed under circumstances that would constitute murder.  The resulting Sentencing Guidelines range would have been 360 months to life imprisonment, but for the fact that 18 U.S.C. § 1951 carries a twenty year statutory maximum sentence.  Therefore, the stipulated Guidelines sentence is 240 months of imprisonment.

## III.     The Defendant's Criminal History

The Plea Agreement also noted two of the defendant's two prior felony convictions.  The first stemmed from his arrest on or about September 27, 2007, after which he was adjudicated as a youthful offender, in Newburgh City Court, of Robbery in the First Degree, in violation of New York Penal Law, Section 160.15(03), and as a result, was sentenced to at least sixty days

Hon. Edgardo Ramos
April 15, 2014
Page 4 of 6

but less than thirteen months' imprisonment.  The second conviction was on or about August 25, 2011, in Orange County Court, when he pled guilty to Burglary in the Third Degree, in violation of New York Penal Law, Section 140.20, which resulted in a sentence of 18 months to 54 months of imprisonment.

In addition, the Probation Department uncovered a third felony conviction which the parties did not know of at the time of the Plea Agreement.  Vassell was arrested on May 31, 2011 after snatching a cellular phone from a victim in Newburgh.  He pled guilty on August 25, 2011, and sentenced to five years of probation.  He was later resentenced, after a violation of the terms of his probation, to 16 months to four years of probation.  With this conviction, the defendant has eight criminal history points, landing him in Criminal History Category IV.

Finally, the Government notes the defendant's troublesome conduct while in the custody of the Bureau of Prisons during the pendency of this case.  In particular, the Government learned of an incident of drug possession for which Vassell was disciplined following a September 11, 2013 conference before this Court.  After the conference, Vassell went down to the cell block at 500 Pearl Street.  After he left the courthouse, Vassell was caught with a small quantity of cocaine, wrapped inside a folded piece of paper, when he was strip searched entering the MCC.

IV.     **The Court Should Sentence Vassell to a Substantial Sentence**

Regarding the Court's contemplated sentence, the Government submits that a Guidelines sentence of 240 months of imprisonment is appropriate for Vassell.  Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005).  "Pursuant to the 'remedy opinion' [in Booker], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006); see also Booker, 543 U.S. at 261-62.  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. Id. at 596; see also United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); see also Fernandez, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."  Fernandez, 443 F.3d at 27; see also Kimbrough v.

Hon. Edgardo Ramos
April 15, 2014
Page 5 of 6

United States, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting Rita v. United States, 127 S. Ct. at 2464-65).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a Guidelines sentence is appropriate for Rashawn Vassell.

As a starting point, there is Vassell's unquestionably, fatally serious conduct. Not only did Vassell participate in a gunpoint robbery of unarmed drug dealers. Not only did that robbery transform into a gunfight in which multiple people were seriously injured. And not only was one of the robbery targets, Jeffrey Henry, killed. But it was Rashawn Vassell, the defendant, who was one of the robbers discharging his firearm in an attempt to escape the apartment building that he and his co-conspirators had decided to rob. In particular, as stated, the CW would testify that Vassell was one of the individuals alternately opening the front door and firing his gun around the door at Henry. It was preciously this conduct – whether or not it was Vassell who actually fired the fatal shots – that caused Henry's death.

Hon. Edgardo Ramos
April 15, 2014
Page 6 of 6

The Government also notes that Vassell's appalling conduct was not a dramatic aberration for Vassell.  Cooperating witnesses would have testified that they have seen Vassell selling crack cocaine and wielding firearms for years – often with many of his current co-defendants – on and around the streets of Newburgh.  They would also testify that Vassell was known throughout Newburgh who had previously committed robberies of drug dealers and other individuals.   Separate and apart from the cooperators, Vassell's history of robberies is evinced by his rap sheet, which includes three theft-related felony convictions.  In short, Vassell's decision to participate in the Jeffrey Henry robbery and murder was not a one-time mistake, but rather the continuation of a pattern of violence and theft that has unfortunately colored much of Vassell's young life.

In addition, the Government is troubled by Vassell's conduct since being arrested in September 2012 – namely, his attempt to smuggle cocaine into the MCC after a conference before Your Honor in September 2013.  The possession of a small amount of cocaine, as a crime, obviously pales into comparison to murder.  But his continued criminal conduct, even when faced with the prospect of significant jail time, demonstrates a lack of respect for the law and a lack of remorse that calls for a serious sentence.

In sum, the 3553(a) goals of "just punishment," "specific deterrence," "general deterrence," and "respect for the law" are especially critical in this case and for this defendant, who has already received a substantial benefit when the Government allowed him to plead guilty only to Count One of the Indictment, thereby capping his maximum exposure at twenty years of imprisonment.  For these reasons, and those stated above, the Government respectfully submits that a Guidelines sentence of 240 months of imprisonment would be appropriate in this case.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _/s/ Andrew Bauer_____
        Andrew Bauer / Kan M. Nawaday
        Assistant United States Attorneys
        Southern District of New York
        (212) 637-2354 / 2311

cc: Andrew G. Patel, Esq. (via e-mail)